**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ALLEN HAMILTON,
          *Petitioner-Appellant,*

          v.

ROBERT L. AYERS,
          *Respondent-Appellee.*

No. 06-99008

D.C. No.
CV-F-90-00363-
OWW-P

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
January 20, 2009—Pasadena, California

Filed September 18, 2009

Before: Kim McLane Wardlaw, William A. Fletcher, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Wardlaw

13575

## COUNSEL

Katherine L. Hart, Law Offices of Katherine L. Hart, Fresno, California; Saor E. Stetler, Law Offices of Saor E. Stetler, Mill Valley, California, for petitioner Michael Allen Hamilton.

Catherine Chatman, Deputy Attorney General, Office of the California Attorney General, Sacramento, California, for respondent Robert L. Ayers.

## OPINION

WARDLAW, Circuit Judge:

Michael Allen Hamilton, a California death row inmate, appeals from the district court's denial of his pre-AEDPA petition for a writ of habeas corpus challenging his 1982 conviction and death penalty sentence for multiple counts of first-degree murder. We deny Hamilton's claims for relief as to the guilt phase. However, we conclude that Hamilton's trial counsel was constitutionally ineffective at the penalty phase for failing to investigate and present to the jury the wealth of classic mitigating evidence that was available to him. Accordingly, we reverse and remand for issuance of the writ, unless the State elects to reprosecute the penalty phase.[1] Because we

---

[1]If the State opts against pursuing further penalty phase proceedings, Hamilton will automatically receive a sentence of life imprisonment without the possibility of parole. *See* Cal. Penal Code § 190.2 (West 1978); *see also Belmontes v. Ayers*, 529 F.3d 834, 837 n.1 (9th Cir. 2008).

grant relief based on the ineffective assistance claim, we do not reach Hamilton's claim of prosecutorial misconduct at the penalty phase.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We recite verbatim the district court's statement of facts, which closely tracks the California Supreme Court's opinion, *see People v. Hamilton*, 774 P.2d 730, 733-35 (Cal. 1989), and which neither party disputes.

> In 1981, Hamilton, his wife Gwendolyn (Gwen) who was pregnant, and their four children, ages six, four, three and one, lived in Bakersfield. In March of that year, the Hamiltons purchased life insurance policies, $175,000 on Hamilton and $100,000 on Gwen, paying the initial premium for coverage until June. When they did not pay the second quarterly payment on time, the agent personally collected the payment from Hamilton, extending the policy into September. When the third premium was not received, the agent again visited the Hamiltons on October 17, collecting payment for two months from Gwen, extending the policies into November.
>
> In September, Hamilton began an extramarital relationship with Brenda Burns. In October, he called his sister Carolyn Hamilton to ask if she knew anyone who would do something illegal for money. Later he told Carolyn he wanted someone to kill Gwen and offered her $20,000 from the insurance on Gwen's life if she would help find someone to do the killing. Hamilton told both Carolyn and his brother-in-law Lyle Palmer that he had a girlfriend, but if he left or divorced Gwen he wouldn't have his kids. Brenda's sister Sharon Burns also testified that Hamilton told her he didn't like the way Gwen was in

bed, sexually, and he wanted to divorce her so he could live with Brenda.

Carolyn first asked another sister, Victoria (Vicki) Hamilton, who agreed to kill Gwen for $10,000 of the insurance money. However, Vicki moved to Texas a few days later. Carolyn then approached Gilbert Garay, a prior acquaintance she met when both worked as security guards for Porterville Private Patrol. Gilbert agreed to kill Gwen for $10,000.

On October 31, Hamilton and Brenda Burns went to K-Mart in Bakersfield and purchased a single-shot 12-gauge shotgun. Hamilton said he left his identification in the car, so Brenda purchased the gun and shells with money furnished by Hamilton.

That evening Hamilton, Gwen, and their children drove to Porterville to take their kids trick-or-treating with Carolyn's son. While accompanying the children trick-or-treating, Hamilton, Carolyn and Gilbert discussed plans for the murder. Hamilton told Carolyn he would start to drive his family home, but then stop on Highway 65 claiming one tire was flat, so that Carolyn and Gilbert could drive by and shoot Gwen. Carolyn and Gilbert left in Carolyn's truck a few minutes after Hamilton. As planned, Carolyn and Gilbert found Hamilton crouched down by the tire with Gwen standing beside him holding a flashlight. Although Carolyn drove by three to four times, Gilbert never pulled the trigger, so they eventually returned to Porterville.

Hamilton phoned Carolyn about an hour later to ask what happened. Carolyn made excuses and Hamilton said they would come back to Porterville the next day. The next day, Hamilton phoned Carolyn to say he would pretend to have lost his wallet while

changing the tire. Hamilton and Gwen would stop at the same place on the pretext of looking for his wallet. Carolyn and Gilbert would follow them and shoot Gwen as previously planned.

That evening, Hamilton and his family again visited Carolyn, his mother and stepfather, Jacqueline (Jackie) and Sam Piper, in Porterville. Carolyn and Gilbert followed Hamilton about a half-hour after he left, and found him and Gwen at the same place, looking for the "lost" wallet. Carolyn and Gilbert drove by several times, but again Gilbert did not shoot. Hamilton was mad when he called Carolyn about an hour later, and she made more excuses.

The following day Hamilton called Carolyn with a new plan. As part of this plan, Carolyn called Gwen and told her that Hamilton's wallet had been found. Hamilton and Gwen for the first time left their children with Gwen's sister, who also lived in Bakersfield, and drove a white pickup truck to Porterville. When they arrived, Hamilton surreptitiously gave Carolyn his wallet, so she could return it to him in front of the family. Hamilton and Carolyn went to pick up Gilbert, and Carolyn and Gilbert told Hamilton they weren't going to shoot Gwen. Hamilton said he would do it. Hamilton said he would be hitchhiking, and instructed Carolyn and Gilbert to pick him up and take him back to his pickup.

This time everything went according to the new plan. Carolyn gave Hamilton an icepick, which he used to jab a hole in one of his pickup's tires. Hamilton stopped the pickup along the highway because one tire was going flat. He left Gwen in the truck and walked along the highway, ostensibly to find a place where he could phone for help. Carolyn and Gilbert picked him up in Carolyn's truck and drove him to

a phone booth, where Hamilton called his mother and asked her to come help him. Mrs. Piper said she could not come until Carolyn returned with the truck. Carolyn and Gilbert then drove Hamilton back to where Gwen was waiting in the pickup. Hamilton took the shotgun, walked over to the pickup, and shot Gwen. He returned to the truck and demanded another shell. After reloading, he went back and shot Gwen again.

Gilbert drove back to the phone booth where they left Hamilton. Carolyn returned home with the truck after she dropped Gilbert off at a friend's house. Carolyn called Hamilton back at the phone booth and said their mother and stepfather were on the way. The Pipers drove Carolyn's truck to pick up Hamilton at the phone booth, and then to where Hamilton "discovered" that Gwen had been killed.

An autopsy revealed the cause of Gwen's death was shotgun wounds to the throat and chest, fired at close range. The fetus was viable and died from anoxia caused by Gwen's death.

Hamilton first told the police that Gwen had been killed while he was hitch-hiking [sic] to the phone booth. The next day, however, he said that she was killed by a Canadian whom he refused to identify. Eventually Vicki told the police of the plan to kill Gwen. With Vicki's consent, the police taped two phone calls between her and Carolyn. Carolyn and Gilbert each confessed when they were arrested, and were each charged with two counts of first degree murder with special circumstances. Both Carolyn and Gilbert agreed to plead guilty to second degree murder with a dangerous-weapon enhancement, and be sentenced to 16 years to life, in return for their testimony against Hamilton at trial. Carolyn and Gil-

bert both testified at trial, identifying Hamilton as
Gwen's killer.

At trial, the defense attempted to show that Gilbert
might have been the actual killer. Lilly Bardsley, the
clerk from K-Mart who testified for the prosecution
that she sold the shotgun to Brenda and Hamilton,
was recalled by the defense and testified instead that
she sold the gun to Brenda's sister Sharon, who was
accompanied by both Hamilton and Gilbert. Sharon,
also recalled by the prosecution in rebuttal, denied
purchasing the shotgun. The ATF form filled out at
the time the gun was purchased was signed with
Brenda's name, and the prosecutor presented expert
testimony that the signature was in Brenda's, not
Sharon's, handwriting. Vicki testified that when she
first talked to Carolyn after the murder, she assumed
Gilbert was the shooter. Another defense witness tes-
tified that prior to Gwen's murder, Hamilton told her
he suspected Vicki and her boyfriend, Stephen Fitz-
herbert (who was Canadian), were planning to kill
him. Hamilton stated, "Well, you know my family,
if they want anything bad enough, they'll kill for it."
Hamilton did not testify.

The jury found Hamilton guilty as charged, and
found true the charged special circumstances of
intentional murder for financial gain, and two counts
of multiple murder. The penalty trial was brief. The
prosecutor presented documentary evidence that ten
years previously Hamilton was convicted of grand
theft. Defense counsel called Hamilton's mother,
who testified that as a child Hamilton had been
removed from the family home because of abusive
conduct by his father, and placed in a series of foster
homes. Hamilton requested permission to read a
statement telling the penalty jury he was not guilty,
but for unspecified reasons beyond his control he

was not permitted to testify or present exonerating evidence, and asking the jury to "return with the penalty described by law for the crime that you have me guilty of." Defense counsel objected, and the court refused to permit Hamilton to read the statement. After approximately four hours, the jury returned a verdict imposing the death penalty.

*Hamilton v. Ayers*, 458 F. Supp. 2d 1075, 1086-89 (E.D. Cal. 2006) (citations omitted).

On direct appeal, the California Supreme Court modified the judgment to set aside one of the multiple-murder special circumstances but otherwise affirmed Hamilton's conviction and sentence, *Hamilton*, 774 P.2d at 758, and denied his petition for rehearing. The U.S. Supreme Court denied certiorari. *Hamilton v. California*, 494 U.S. 1039 (1990).

In June 1991, Hamilton filed a habeas petition in the United States District Court for the Eastern District of California. The district court instructed him to exhaust his state court remedies. Hamilton then filed a habeas petition in the California Supreme Court in July 1994. Following a two-day evidentiary hearing on an allegation of juror misconduct, the California Supreme Court found that no misconduct had occurred, and summarily rejected Hamilton's other claims. *In re Hamilton*, 975 P.2d 600 (Cal. 1999).

Hamilton filed an amended federal habeas petition in 2000. He requested an evidentiary hearing, which the district court granted only as to the issue of ineffective assistance of counsel at the penalty phase. A two-day hearing was held in December 2003, and reopened in September 2004. On October 30, 2006, the district court denied Hamilton's habeas petition in full. *Hamilton*, 458 F. Supp. 2d at 1152. Hamilton

timely appeals from the district court's denial of his habeas petition.[2]

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction to entertain Hamilton's habeas petition under 28 U.S.C. § 2254. We have jurisdiction over Hamilton's appeal under 28 U.S.C. § 2253.

Because Hamilton's first federal habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), pre-AEDPA standards apply to his claims. *See Correll v. Ryan*, 539 F.3d 938, 941-42 (9th Cir. 2008). We review de novo the district court's denial of habeas relief, *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006), but review for clear error the district court's factual findings, *Frierson v. Woodford*, 463 F.3d 982, 988 (9th Cir. 2006). "Although less deference to state court factual findings is required under the pre-AEDPA law . . ., such factual findings are nonetheless entitled to a presumption of correctness unless they are not fairly supported by the record." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citing to 28 U.S.C. § 2254(d)(8)) (internal quotation marks omitted).

We also review de novo "mixed questions of law and fact, whether decided by the district court or the state courts." *Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008) (*Brady/Napue* claim); *see Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (en banc) (juror bias claim); *Frierson*, 463 F.3d at 988 (ineffective assistance of counsel claim).

---

[2]The district court granted a Certificate of Appealability ("COA") on Hamilton's *Brady/Napue* and ineffective assistance of counsel claims. We granted Hamilton's motion to broaden the COA to include his prosecutorial and juror misconduct claims. *See Slack v. McDaniel*, 529 U.S. 473, 482-84 (2000).

## III.  DISCUSSION

### A.  *Guilt Phase Claims*

### 1.  Juror Bias

Hamilton challenges his conviction on grounds of juror bias and misconduct. His allegations stem from a declaration prepared by investigators from the California Appellate Project ("CAP") in 1994, which juror Geneva Gholston signed. The 1994 declaration stated that (1) before trial, Gholston discussed with a neighbor Hamilton's "ridiculous" story that a Canadian had murdered his wife, and the two agreed that Hamilton was guilty; (2) Gholston "prayed" to sit on Hamilton's jury after the spirit of her deceased Uncle Frank, who had been a bank robber and killer, exhorted her to atone for his wrongs; (3) during trial, Gholston saw the "skinnier" of Hamilton's sisters watching her from a car in the alley behind Gholston's home, which prompted Gholston to request increased police patrols; and (4) Gholston collected newspaper articles about Hamilton during the trial. *In re Hamilton*, 975 P.2d at 605-06, 617 n.21. "None of these matters had been brought to the attention of [the] court or counsel at petitioner's trial." *Id.* at 605.

Responding to the 1994 declaration, the California Supreme Court ordered the Director of Corrections to show cause why Hamilton's conviction and death sentence "should not be vacated on grounds that Juror Geneva Gholston was actually biased and/or incompetent when sworn as a juror, and that she committed prejudicial misconduct by concealing her bias during the jury selection process." *Id.* at 605. In 1996, at the instigation of the California Attorney General, Gholston submitted a second declaration, which stated that (1) the CAP investigators did not identify themselves as working on behalf of Hamilton; (2) they did not record or take notes of their interview with Gholston; (3) Gholston did not read or receive a copy of the 1994 declaration; (4) the 1994 declaration was

wrong in several material respects, particularly with regard to Uncle Frank; and (5) the encounter in the alley did not affect her participation as a juror. *Id.* at 605-06.

Confronted with these conflicting declarations, the California Supreme Court ordered an evidentiary hearing, which took place in November 1997. At the hearing, Gholston, one of the CAP investigators, and others testified extensively over two full days. *Id.* at 606-12 (summarizing testimony). Reviewing the evidence presented at the 1997 hearing, the state court referee concluded that

> (1) petitioner has failed to show by a preponderance of evidence that Gholston either harbored or concealed pretrial bias, (2) any inaccurate responses by Gholston on voir dire were inadvertent, not deliberate, and (3) if Gholston saw petitioner's sister in the alley behind Gholston's home during the trial, the experience did not cause Gholston to prejudge petitioner's case.

*Id.* at 612. The California Supreme Court adopted the referee's findings and denied Hamilton's habeas petition. *See id.* at 615-21.

Hamilton challenges each of these determinations, arguing primarily that the referee's findings were erroneous. Generally, we review de novo the district court's denial of pre-AEDPA claims of implied bias in habeas petitions, "because implied bias is a mixed question of law and fact." *Fields*, 503 F.3d at 770. To justify a new trial based on a claim of juror bias, Hamilton must demonstrate that a dishonest answer was given on voir dire to a material question and that the correct response would have provided a valid basis for a challenge for cause, *see McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984), or that his right to an impartial jury, guaranteed by the Sixth and Fourteenth Amendments, was otherwise violated by actual or implied juror bias, *see Fields*,

503 F.3d at 766-68; *see also Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992); *Remmer v. United States*, 347 U.S. 227, 229 (1954). Hamilton must also surmount the "presumption of correctness" that we afford to the state courts' factual conclusions regarding the possibility of prejudicial misconduct. 28 U.S.C. § 2254(e)(1); *see Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (noting requirement that presumptive weight be accorded to a trial court's resolution of factual issues, including juror impartiality, because the resolution of such issues "depends heavily on the trial court's appraisal of witness credibility and demeanor"). For the reasons that follow, we affirm the district court's rejection of these claims.

### a)    *Implied or Concealed Bias*

#### i.    *Pretrial Conversations*

**[1]** Gholston omitted from her voir dire responses any mention of a pretrial conversation she had with a neighbor regarding Hamilton's suggestion that a Canadian had murdered his wife. In answering the voir dire questions, however, Gholston acknowledged her basic familiarity with the circumstances of the crime. In fact, when asked whether the material she had read caused her to form an opinion regarding the guilt or innocence of the defendant, she answered: "No, it really didn't." Moreover, the record confirms that "Gholston's omissions on voir dire were *inadvertent*, not intentional," and that "even if Gholston's voir dire answers understated her pretrial awareness and impressions about the case, particularly with respect to petitioner's claim of a Canadian killer, her omissions did not lead to the seating of a biased juror." *In re Hamilton*, 975 P.2d at 616.

#### ii.    *Newspaper Clippings*

**[2]** Gholston testified at the 1997 hearing that while her husband clipped some newspaper articles to be saved for her sister, she did not personally make any clippings. The Califor-

nia Supreme Court noted that the referee did not make a finding regarding whether Gholston actually clipped any articles during the trial, but concluded that even if such misconduct had occurred, "any presumption of prejudice is rebutted" because the "clippings contained mere neutral and evenhanded accounts of the trial." *Id.* at 617 n.21. We agree. Moreover, as the California Supreme Court observed, "[n]o strong inference of bias arises simply because a juror failed to resist the temptation to read news articles," and "[t]here is no evidence that Gholston discussed these articles with other jurors or otherwise employed them in her deliberations." *Id.* Therefore, the clippings do not support a claim of implied or concealed bias.

###### iii.    *Uncle Frank*

Gholston testified at the 1997 hearing that as she was considering how to get out of serving on the Hamilton jury, she experienced a clearing of conscience, or a clearing of the mind, that led her to conclude that she should not fabricate an excuse to avoid jury service. In her own words: "it was just my mind cleared up and I said well, I have no excuse." At another point, Gholston testified that Uncle Frank may have caused her to have this clearing of conscience, but she also stated that he never spoke to her and she never felt his presence. Any potential inconsistency in this testimony is easily resolved through the possibilities that Gholston attributed her clearing of mind to Uncle Frank after she experienced it, or that thinking about her uncle triggered her clearing of mind. Accordingly, the record fairly supports the California Supreme Court's finding that Gholston "experienced no direct encounter with her Uncle Frank's spirit," and that the fact that she in some sense "felt the uncle's presence, and was thereby reassured to serve and to render her verdicts, did not cause her to prejudge the case." *Id.* at 618.

###### iv.    *The 1994 Declaration*

The referee did not resolve the question of whether Gholston actually reviewed and approved the 1994 declaration pre-

pared by the CAP investigators, although the referee did determine, and the California Supreme Court agreed, that the declaration's "extreme statements" regarding Uncle Frank did not "accurately convey the experience Gholston was trying to describe." *Id.*

[3] Hamilton argues that the enthusiasm with which Gholston repudiated all signatures and initials attributed to her, even those from the 1996 declaration prepared by the California Attorney General, as well as her extreme position that she never even saw the 1994 declaration, indicates willful deceptiveness on Gholston's part. The scope of Gholston's repudiation may have been excessive, but her vehemence at the 1997 hearing does not necessarily lead to the conclusion that all of her testimony should be discredited. Further, while the testimony of CAP investigator Scarlet Nerad did conflict with Gholston's testimony, the record demonstrates why the referee credited Gholston's testimony over Nerad's. Specifically, the 1997 hearing transcript supports the conclusions that (1) Gholston did not understand the purpose of the investigators' 1994 visits; (2) Gholston did not pay attention to what she was signing; and (3) Gholston's 1997 testimony about her experiences in 1994 and during Hamilton's trial was generally reliable, though tinged at times by exaggerated, overemphatic denials.

The State accurately distinguishes the cases Hamilton offers in support of this claim. In *Dyer v. Calderon*, we explicitly found not only that "the facts were not properly developed by the state court," but also that the potentially biased juror had "plainly lied" in answering certain questions and that "no rational trier of fact could find otherwise." 151 F.3d 970, 979 (9th Cir. 1998) (en banc). Specifically, the juror stated on voir dire that no member of her family had been the victim of a homicide, when in fact her brother had been murdered. *Id.* at 972-73. When questioned during trial about this omission, she stated she thought the killing was an accident, although the circumstances of the crime actually confirmed

that the killing was deliberate. *Id.* at 974. Nonetheless, after a brief in camera hearing, the judge concluded the juror was not biased. *Id.* at 975. We disagreed, finding implied bias where a juror "chose to conceal a very major crime—the killing of her brother in a way that she knew was very similar to the way [the petitioner] was accused of killing his victims." *Id.* at 982. In contrast to *Dyer*, California provided Hamilton with a two-day evidentiary hearing on the issue of juror misconduct. Further, Gholston's incomplete voir dire answers were not "plain lies," and Hamilton has failed to demonstrate the necessary "excess of zeal" that led the *Dyer* panel to infer the impermissible taint of bias. *Id.*

Similarly, in *Green v. White*, the allegedly biased juror did not disclose a prior assault conviction. We found it "hard to imagine that [the juror] could have forgotten about the six months he spent in the brig for the past assault, no matter how much time had passed." 232 F.3d 671, 676 (9th Cir. 2000). In contrast, it is not hard to imagine that, several months after briefly discussing the Hamilton murder with a neighbor and reading about it in multiple newspapers, Gholston only recalled her primary source of information.

b)     *Actual Bias from the "Encounter"*

**[4]** So far as the potential impact on Gholston is concerned, it is irrelevant whether Vicki (the "skinnier" Hamilton sister) and her fiancé were actually parked in the car that Gholston saw in the alley behind her home. Aside from conclusory allegations, Hamilton fails to explain how the supposed encounter engendered bias. In theory, an encounter of this nature could introduce the "kind of unpredictable factor into the jury room that the doctrine of implied bias is meant to keep out." *Dyer*, 151 F.3d at 982. Nonetheless, Hamilton fails to overcome the presumption of correctness we accord the state's findings on this issue. As the California Supreme Court found:

> The episode described by Gholston was brief, isolated, and ambiguous. The people Gholston saw

parked in her alley did not approach or speak to her. Gholston mentioned no display of weapons or threatening gestures. According to Gholston, the two individuals simply sat in their car, and they drove away rapidly the instant they realized that Gholston had seen them. By Gholston's own account, "it never occurred to [her]" to report the incident to the trial court. She further insisted she never discussed the incident with other jurors, and there is no contrary evidence.

*In re Hamilton*, 975 P.2d at 621 (alteration in original). We agree with the California Supreme Court that the "episode affords no basis for relief," *id.*, and affirm the district court's conclusion that Hamilton has not shown, and the record does not reveal, that Gholston was biased against him. *Cf. United States v. Armstrong*, 654 F.2d 1328, 1333 (9th Cir. 1981) (finding no abuse of discretion in the district court's refusal to declare a mistrial as a result of phone calls received by a juror's husband, where the calls "did not refer to the merits," "did not articulate threats," and were not "identified with either side," and agreeing with the district court that any resulting irregularity did not compromise the "essential fairness of the process").

## B. *Brady* and *Napue* Claims

[5] Hamilton claims that the prosecution suppressed evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see also Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959). Specifically, he argues that the prosecution withheld evidence of certain terms of Gilbert's plea agreement and of his personal ties to one of the Sheriff's detectives who investigated the case, Detective Jay Salazar; that the prosecution ordered Gilbert to conform his testimony to a "scripted" statement and pressured him to "round up" alibi

witnesses; and that the prosecution withheld evidence of concessions Vicki received in exchange for her testimony. The California Supreme Court summarily rejected Hamilton's *Brady* and *Napue* claims, and the district court denied them on the merits. The district court also denied Hamilton's request for an evidentiary hearing on these claims pursuant to *Townsend v. Sain*, 372 U.S. 293, 312 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5-6 (1992), and its progeny, *see, e.g.*, *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005). We agree with the district court.

There are three components to a *Brady* violation: (1) exculpatory or impeaching evidence favorable to the accused; (2) suppressed by the State; (3) resulting in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To establish prejudice under *Brady*, Hamilton must demonstrate a " 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). In contrast, where the prosecution presents or fails to correct false evidence in violation of *Napue*, we assess whether there is " 'any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.' " *Jackson*, 513 F.3d at 1078 (quoting *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc)). "The materiality of suppressed evidence is 'considered collectively, not item by item.' " *Id.* at 1071 (quoting *Kyles*, 514 U.S. at 436).[3] Even

---

[3]In *Jackson*, we described the analytical model for collectively assessing the materiality of *Brady* and *Napue* claims:

Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge. The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence

viewed collectively, however, the suppressed evidence at issue does not reveal a reasonable probability that the result of Hamilton's trial would have been different. Indeed, compared to the overwhelming evidence of Hamilton's guilt, the allegedly suppressed evidence is relatively insignificant.

First, the jury received ample evidence of the connections between Gilbert's family and Detective Salazar. The significance of any additional evidence regarding these connections appears minimal and is unlikely to have altered the jury's assessment of the evidence.

Second, the State convincingly explains that Gilbert was not forced to conform his testimony to a "scripted" statement. The prosecution's treatment of Gilbert subsequent to Lilly Bardsley's identification of him as the third participant in the purchase of the shotgun at K-Mart appears consistent with a general and unsurprising concern that Gilbert might not have testified truthfully. Indeed, had Gilbert been unable to confirm his whereabouts on the Halloween evening the shotgun was purchased, the prosecution may well have been justified in

---

in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes*, 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley*, 473 U.S. at 682, 105 S. Ct. 3375 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce*, 25 F. Supp. 2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd*, 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S. Ct. 1555.

513 F.3d at 1076 (alteration in original).

withdrawing the plea agreement, which was conditioned on Gilbert's honest and truthful testimony at trial. Because Gilbert explained the conditions of his plea agreement in open court, it is clear that everyone, including the jury, knew full well that if Gilbert had lied on the stand, he would have violated the terms of his deal. Thus, as soon as Bardsley identified Gilbert and thereby controverted his testimony, it would have been apparent that Gilbert's plea agreement was imperiled. Defense counsel's failure to examine Gilbert on this issue cannot be attributed to the prosecution. Moreover, this situation is markedly distinct from *Smith v. Baldwin*, in which the "prosecutor informed [a witness] that if he insisted on testifying in accordance with his recantations, the state would seek to set aside his plea agreement in this case, subjecting [him] to capital murder charges." 510 F.3d 1127, 1136 (9th Cir. 2007) (en banc). Unlike the witness in *Smith*, Gilbert never attempted to recant his testimony. On the contrary, after Bardsley testified that Gilbert was present at the shotgun purchase, he simply produced alibi witnesses to confirm his consistent statement that he spent the late afternoon and evening trick-or-treating.[4]

Third, given that Gilbert faced the death penalty in the absence of his plea agreement, the prosecution's facilitation of Gilbert's release on bond during the trial appears insignificant. Moreover, Gilbert's testimony that his release on bail was not part of the plea agreement appears consistent with the statement in his declaration that "the prosecutor said he would not object to the court setting bail, and I accepted the plea bargain." After all, the court made the ultimate decision regard-

---

[4]Hamilton argues that Gilbert's initial testimony that he was trick-or-treating with his child is inconsistent with the rebuttal testimony that provided the details of his excursions. However, Hamilton fails to identify any actual conflict, pointing at best to minor and unsurprising discrepancies regarding the timing of Gilbert's activities. Accordingly, the district court's factual finding that the "rebuttal witnesses' testimony was in fact consistent with Gilbert's testimony on direct examination" is not clearly erroneous.

ing bail, not the prosecution. Regardless, this additional inducement could not have affected the jury's scrutiny of Gilbert's testimony, given what the jury already knew about Gilbert's involvement in the murders and the other inducements he received to testify. Even assuming the prosecution's failure to correct this testimony at trial implicated *Napue*, there does not appear to be " 'any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.' " *Jackson*, 513 F.3d at 1078 (quoting *Hayes*, 399 F.3d at 985).

Fourth, while Hamilton argues that the facts are in dispute as to the threats and inducements provided to Gilbert to elicit his testimony, it appears that the only real dispute pertains to the significance of such threats and inducements. To the extent any factual disputes remain, the resolution of these disputes in Hamilton's favor does not alter the prejudice analysis.

Finally, although there is some conflict between Gilbert's description of the murders in his 1994 declaration and his trial testimony that he looked away when the shots were fired,[5] the fact that Gilbert actually watched the shootings is not probative of who pulled the trigger, and it is undisputed that Gilbert and Carolyn were present during the murders. As the State observes, this graphic testimony may have made Gilbert's testimony even more damaging.

---

[5]In a 1994 declaration, Gilbert described the shooting as follows:

> I remember Gwendolyn opening the window part-way, swatting away the barrel of the shotgun when it was put through the partially-open window, and after the door was opened the blast of the first shot knocking her in slow motion back and to the side. I can still see her as she fell over, but with her eyes still open and staring straight ahead. Then the second shot knocked her further over, and as she slumped down her hair was caught in the gun-rack and she could not fall any more.

Hamilton argues that Gilbert's recollection of the shooting, which conflicts with his testimony at trial that he looked away when the shots are fired, shows that Gilbert was the shooter.

**[6]** Assuming Hamilton has otherwise identified *Brady* and *Napue* violations, he fails to establish that those violations are material. *Cf. Jackson*, 513 F.3d at 1075-79. In *Jackson*, we found material violations of *Napue* where the prosecution's solicitation of perjured testimony bolstered the credibility of two "key" witnesses, "whereas the truthful testimony would have substantially impeached" those witnesses' credibility. *Id.* at 1078. Similarly, in *Hayes*, in which the "State knowingly presented false evidence to the jury and made false representations to the trial judge as to whether the State had agreed not to prosecute [a lead witness] on his pending felony charges," 399 F.3d at 978, we also found violations of *Napue*, reasoning that the witness's credibility would have been affected if the jury had been informed of the "critical deal," *id.* at 987.

Gilbert's testimony was admittedly critical to the prosecution's case against Hamilton. However, in contrast to both *Jackson* and *Hayes*, it is difficult to imagine Gilbert's credibility being even remotely affected by the correction or clarification of his testimony regarding the prosecution's involvement in his release on bail. The same is true of Vicki's possibly false testimony regarding additional benefits she and her fiancé received in exchange for their testimony. Once again, in light of the benefits of which the jury was already aware, the additional benefits would have been cumulative and insignificant. Accordingly, the *Napue* violations are not collectively material.

**[7]** Similarly, considering all the possible *Brady* and *Napue* violations together, there is no reasonable probability that the outcome of the guilt phase of Hamilton's trial would have been different. The suppressed evidence and possible falsehoods pertained to the details of collateral matters with which the jury was well acquainted. Accordingly, because Hamilton has not shown that his "allegations, if proved, would entitle him to relief," an evidentiary hearing on these claims was not required. *Insyxiengmay*, 403 F.3d at 670 (internal quotation marks omitted).

The overwhelming evidence of Hamilton's guilt only strengthens our conclusion that he was not prejudiced by the alleged *Brady* and *Napue* violations. In light of this evidence, defense counsel's failure to prepare effectively for the penalty phase of Hamilton's trial is all the more egregious.

## C.   *Penalty Phase Claims*

Hamilton asserts two penalty phase claims. Because we grant relief as to Hamilton's claim of ineffective assistance of counsel, we do not reach his claim of prosecutorial misconduct.

To prevail on his claim of ineffective assistance of counsel, Hamilton must demonstrate that his trial counsel's penalty phase performance "fell below an objective standard of reasonableness" at the time of trial, *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

### 1.   *Deficient Performance*

Although the Supreme Court "ha[s] declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms,' " *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (alteration omitted) (quoting *Strickland*, 466 U.S. at 688), "general principles have emerged regarding the duties of criminal defense attorneys that inform our view as to the 'objective standard of reasonableness' by which we assess attorney performance, particularly with respect to the duty to investigate," *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (en banc).

[8] At the time of Hamilton's trial, his counsel had a duty to conduct "a thorough investigation of the defendant's back-

ground." *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see Ainsworth v. Woodford*, 268 F.3d 868, 873-74 (9th Cir. 2001). Because "[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy," *Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1995) (citing *Deutscher v. Whitley*, 884 F.2d 1151, 1152 (9th Cir. 1989)) (internal quotation marks omitted), "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase," *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999). To that end, trial counsel must inquire into a defendant's "social background, . . . family abuse, mental impairment, physical health history, and substance abuse history," *Correll*, 539 F.3d at 943; obtain and examine "mental and physical health records, school records, and criminal records," *id.*; *see Summerlin*, 427 F.3d at 630; consult with appropriate medical experts, *Mayfield v. Woodford*, 270 F.3d 915, 927-28 (9th Cir. 2001) (en banc); and pursue relevant leads, *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (per curiam). Although "we must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight,' " *Mayfield*, 270 F.3d at 927 (quoting *Strickland*, 466 U.S. at 689), we need not defer to counsel's choices at trial unless "those choices [were] made after counsel . . . conducted reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary," *Summerlin*, 427 F.3d at 630 (third alteration in original) (internal quotation marks omitted).

**[9]** Counsel also has an obligation to present and explain to the jury all available mitigating evidence. *Correll*, 539 F.3d at 946. Evidence about the defendant's background and character is relevant to the jury's determination "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382 (1990) (emphasis and internal

quotation marks omitted). In a capital case, such evidence can be the difference between a life sentence and a sentence of death. *See Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam) ("[T]he issue for the jury is whether the defendant will live or die . . . . To fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." (second alteration in original)).

a)    *Penalty Phase Investigation*

What little investigation Hamilton's counsel did for the penalty phase was revealed at the evidentiary hearing held before the district court in December 2003. Hamilton testified and presented testimony from his defense counsel and Philip Cherney, an expert on ineffective assistance of counsel claims. The State presented the testimony of the defense investigator, Danny Wells.

Defense counsel testified that Hamilton's case was the first capital case on which he had worked. However, counsel did not retain anyone other than Wells to assist with the penalty phase preparations. In fact, he never even thought about retaining a mitigation expert or a mental health expert. Moreover, he did not have the benefit of a more experienced attorney's advice, as he did not associate co-counsel for Hamilton's case.[6]

Wells had never previously worked with Hamilton's counsel. At the time, Wells did not have any training in conducting an investigation for the penalty phase of a capital case. He could not specifically recall whether he had worked on any death penalty cases before Hamilton's.

---

[6]We need not decide whether the failure to associate co-counsel alone suffices to render counsel's performance deficient, *cf. Mayfield*, 270 F.3d at 927 (citing *Keenan v. Superior Court*, 640 P.2d 108 (Cal. 1982)), as counsel's performance here was deficient without placing this fact into the mix.

Defense counsel testified that he began working on the penalty phase while preparing for the guilt phase. He acknowledged that Wells did the majority of the investigation for the guilt and penalty phases. Both defense counsel and Wells testified that the case file appeared to be incomplete, but neither could state definitively which, if any, documents were missing. Defense counsel explained that after the trial ended, he provided the entire case file to Hamilton's first appellate attorney, Betty Dawson. Neither defense counsel nor anyone in his office made copies of any of the documents before turning them over to Dawson.

**[10]** According to the documents that were included in the file, the investigation consisted of at most five interviews: (1) Vicki (Hamilton's sister); (2) Marvin Hamilton (Hamilton's uncle); (3) Patti Ketchum (the foster sister of Hamilton's sister Carolyn); (4) Ron Stafford (Carolyn's then-boyfriend); and (5) John Stevens (an acquaintance of Carolyn's). The interviews took place shortly before jury selection began. Wells conducted all of the interviews on his own, except Vicki's. Defense counsel participated in Vicki's interview, during which he and Wells questioned her about Hamilton's "past including his childhood," according to Wells's notes. However, the notes from Vicki's interview in fact do not mention anything about Hamilton's childhood. Nor does Vicki's declaration in support of Hamilton's habeas petition clarify whether she was asked about his childhood during her interview. In light of Wells's evidentiary hearing testimony that if Vicki had relayed information about Hamilton's childhood, he would have included it in his notes, the district court's finding that defense counsel and Wells obtained such information about Hamilton's childhood from Vicki is clearly erroneous. As we discuss below, Vicki could have provided countless details about the physical and mental abuse Hamilton suffered as a child. Counsel thus acted deficiently in failing to interview this key witness about Hamilton's childhood background.

**[11]** That defense counsel did not adequately investigate the available mitigating evidence is even more apparent in his response to Well's interview with Marvin Hamilton, as documented. As noted above, in 1967 Hamilton was placed with Marvin after Carolyn disclosed to a relative that her father had been sexually abusing her for years and that her mother had acquiesced in the abuse. Wells's interview notes demonstrate that Marvin was well aware of the abuse: "[Marvin] said that [Hamilton's father, Bob,] was molesting Carolyn and he went to jail for it and so did thier [sic] mother because she knew about it and did nothing about it." Marvin also mentioned that Hamilton had "mov[ed] from one military base to another" throughout his childhood. Defense counsel specifically recalled that he reviewed Wells's report, but that he did not ask Wells to investigate further into the alleged abuse or Bob's military records. Counsel acted deficiently in failing to pursue such classic mitigating evidence. *See Lambright*, 490 F.3d at 1117 ("[W]hen tantalizing indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued." (internal quotation marks omitted)); *see also Wiggins*, 539 U.S. at 525 ("[A]ny reasonably competent attorney would have realized that pursuing . . . leads [regarding the petitioner's traumatic childhood] was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.").

The other three interviews unearthed no information about Hamilton's background, which is not surprising, given that each of them lasted only one to two minutes. Defense counsel likely never intended to obtain information from these witnesses for purposes of the penalty phase defense, as they barely knew Hamilton. They were involved in the case only because of their knowledge of events that occurred shortly before and after the crime.

**[12]** Most of the available witnesses who could have provided vital information about Hamilton's background were

never contacted by anyone working on Hamilton's behalf at the time of trial. The district court thus clearly erred in finding that either defense counsel or Wells "did interview the available witnesses, and no better, available witness about Hamilton's background and social history other than his mother was uncovered." Counsel's failure "to contact persons who might have had more detailed information about [Hamilton's] past," when the initial investigation put counsel on notice that Hamilton "had a particularly difficult childhood," renders his performance deficient. *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003).

**[13]** There was also available documentary evidence at the time of trial that could and should have been investigated as part of the penalty phase investigation. Many of these documents were in fact in defense counsel's possession, but he never reviewed them. The existence of these documents came to light after the 2003 evidentiary hearing, when Hamilton's habeas counsel filed over two hundred pages of newly discovered documents that she had found in a file labeled "Hamilton Prior Record." The file contained the following:

- March 1967 Kern County Juvenile Court Petition (alleges that Hamilton's home was unfit due to abuse and incest)

- April 1967 Kern County Juvenile Department Report of Probation Officer (describes in detail the abuse and incest; recommends that Hamilton be declared a dependant child of the court)

- April 1967 Kern County Juvenile Department Supplemental Report of Probation Officer (describes arrests of Hamilton's father and mother for incest and contributing to the delinquency of a minor; notes that Hamilton's father was committed to Atascadero State Hospital and

his mother was sentenced to thirty days' imprisonment and three years' probation)

- April 1967 Kern County Juvenile Court Hearing (adjudges Hamilton a dependant child of the court)

- April 1967 Kern County Juvenile Court Findings and Order of Referee (places Hamilton in the care of the Kern County Probation Department)

- May 1967 Kern County Juvenile Court Home Placement Order (places Hamilton in Marvin's home)

- April 1968 Kern County Juvenile Court Home Placement Order (places Hamilton in the care of the Kern County Welfare Department)

- May 1968 Kern County Juvenile Court Medical Court Order (authorizes the undersigned doctor to perform surgery on Hamilton's fractured clavicle)

- January 1969 Kern County Juvenile Court Findings and Order of Referee (declares Hamilton a ward of the court and places him in the care of the Kern County Probation Department)

- February 1969 Kern County Juvenile Court Home Placement Order (places Hamilton in the home of foster parent Ruby Carter)

- June 1969 Kern County Juvenile Court Home Placement Order (places Hamilton in his mother's home but leaves unchanged his status as a ward of the court)

- October 1969 Kern County Juvenile Court Order Granting Consent to Marry (grants Hamilton's petition to marry Christine Grealish)

- December 1969 Kern County Juvenile Court Request and Order for Dismissal of Juvenile Court Case (based on Hamilton turning eighteen and complying with probation requirements)

- 1966-1970 Kern County Union High School District Permanent Record (lists Hamilton's classes and grades at Bakersfield High School and Foothill High School)

- Kern County Criminal Record (includes juvenile and adult records for various offenses committed by Hamilton, including grand theft, burglary, and passing bad checks)

- FBI Criminal Record (lists various offenses committed by Hamilton between 1970 and 1972, including grand theft, deserting the U.S. Army, a hold for going AWOL, failure to appear, and burglary)[7]

It is undisputed that Wells obtained these documents prior to the penalty phase. Intermingled with the other documents was a two-page investigative report written by Wells on October 8, 1982, two days after the trial began. In the report, Wells notes that, on October 7, 1982, he went to the Bakersfield Welfare Department, Juvenile Probation Department, and Adult Probation Department to search for records, but was told that Hamilton's records had been destroyed. He was more successful at the Kern County Clerk's Office, where he

---

[7]The file also contained a letter dated September 1982, written by Hamilton, in which he recounts his life history. As we briefly explain below, the authenticity of this letter is disputed.

obtained a certified copy of Hamilton's juvenile record. He also visited Bakersfield High School and Foothill High School, where he obtained all school records for Hamilton that had not already been destroyed. Wells's report is corroborated by the records themselves, most of which bear a certification stamp dated October 7, 1982.[8] Yet, some of the records were not sent to Wells until November 16, 1982,[9] two days before Hamilton was sentenced to death.

Defense counsel testified at the 2003 evidentiary hearing that he vaguely recalled asking Wells to obtain Hamilton's juvenile dependency records and other relevant documents. He admitted, however, that he never knew "what the outcome was of [Wells's search]." He believed that no records had been available, yet acknowledged that he had not used the subpoena power of the court to try to obtain them. In light of this testimony, the district court's finding that "counsel did obtain and review[ ] the records which were available" is clearly erroneous. Given the limited information about Hamilton's background that counsel already knew from Marvin's interview, he acted deficiently in not reviewing the records that Wells obtained or attempting to pursue other avenues of investigation. *See Correll*, 539 F.3d at 943.

**[14]** Counsel also failed to investigate Hamilton's mental health history and mental state at the time of trial. *See Summerlin*, 427 F.3d at 630 ("We have long recognized an attorney's duty to investigate and present mitigating evidence of mental impairment. This includes examination of mental health records." (citation and internal quotation marks omit-

---

[8]The stamp reads: "The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in my office." The stamp is signed by the Deputy County Clerk and Clerk of the Superior Court of Kern County.

[9]These records bear a certified stamp dated November 16, 1982. A copy order form included in the file confirms this date; it is addressed to "Dan Wells" and notes that ten pages of certified documents are attached.

ted)); *see also Hendricks*, 70 F.3d at 1043 ("Evidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase." (citing Cal. Penal Code § 190.3(d), (h)). As we discuss below, then available documentary evidence revealed that Hamilton had suffered from serious mental illnesses throughout most of his life. Moreover, counsel was aware that Hamilton tried to commit suicide in prison shortly after his wife's death, and that he was taking antidepressant medication at the time of trial.

Defense counsel thus should have retained a mental health expert and provided the expert with the information needed to form an accurate profile of Hamilton's mental health. *See Caro v. Woodford*, 280 F.3d 1247, 1254-55 (9th Cir. 2002); *Mayfield*, 270 F.3d at 927. We have found ineffective assistance under similar circumstances. *See, e.g.*, *Evans v. Lewis*, 855 F.2d 631, 636 (9th Cir. 1988) (holding that counsel was ineffective where he "conducted no investigation to ascertain the extent of any possible mental impairment" even though documents available to counsel prior to the sentencing hearing plainly indicated that the defendant had a history of mental problems and had even attempted suicide while in prison); *see also Hendricks*, 70 F.3d at 1043 ("[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance.").

Although the district court did not think it dispositive or even make a finding on the issue, the State places much reliance on Hamilton's asserted lack of cooperation. The State contends that further efforts by defense counsel would have been unavailing because there is "no indication that Hamilton would have cooperated" with the investigation. The extent to which Hamilton refused to assist in the investigation was disputed at the evidentiary hearing. Defense counsel testified that Hamilton refused to answer questions or provide relevant

sources of information, which Wells confirmed. Yet, this testimony was undermined by defense counsel's admission that he did not even ask Hamilton to complete a basic biographical information form at the outset of his investigation. In fact, defense counsel could not recall which specific information he asked Hamilton to provide. Further, Hamilton testified that he supplied counsel with an "extraordinary amount of information." He admitted being "antagonistic at times," but claimed that, overall, he had been "more than cooperative." Counsel also testified that Hamilton insisted on receiving the death penalty if he were found guilty. The State suggests that this testimony is corroborated by the statement Hamilton tried to read to the jury at the outset of the penalty phase.[10] Most fairly read, however, this statement reveals only Hamilton's insistence on his innocence and his belief that presenting mitigating evidence would be tantamount to admitting guilt.

---

[10]The statement that Hamilton wanted to read at trial is similar to a letter he wrote to defense counsel on October 19, 1982, shortly after trial began. In the letter, which was introduced at the evidentiary hearing, Hamilton states:

> I don't want to live the rest of my life in prison knowing I was there for something I didn't do. I would rather receive the Death Penalty that way on my automatic appeal, some other attorney may do what you failed too [sic]; and prove I am not guilty. No, if it gets [as] far [as the penalty phase] I won't have you pleading for my life or fabricating any mitigating circumstances to a crime I didn't commit. The only thing I will want is for the press to be at the penalty phase to hear a brief statement I will write up for you to read to them and the jury.

Hamilton does not dispute that he wrote the letter. He argues, however, that we should consider it in conjunction with a nine-page letter he allegedly wrote defense counsel on September 20, 1982, in which he recounts his life history. The district court reopened the evidentiary hearing in September 2004, for the limited purpose of evaluating the authenticity of this letter. The district court expressed "grave doubts" about whether Hamilton had in fact written it at the time of trial, but did not make a finding as to the letter's authenticity. Given our conclusion that defense counsel was deficient even assuming Hamilton failed to cooperate, we need not resolve whether Hamilton wrote the letter at the time of trial or during his habeas proceedings.

**[15]** Even if we accept defense counsel's version of the events, we would nevertheless find his investigation deficient. A defendant's lack of cooperation does not eliminate counsel's duty to investigate. *See* 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) ("The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."). On the contrary, "if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." *Silva*, 279 F.3d at 847; *see, e.g.*, *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (determining that the defendant's lack of cooperation did not excuse counsel from further investigating mitigating evidence, especially given that "counsel was aware [that the defendant suffered] childhood abuse and there was essentially no other significant mitigating evidence to present to the jury").

We recognize that both the Supreme Court and we have found that a defendant's refusal to cooperate in the penalty phase may render counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances. *See, e.g.*, *Schriro v. Landrigan*, 550 U.S. 465, 475-77 (2007); *Jeffries v. Blodgett*, 5 F.3d 1180, 1197-98 (9th Cir. 1993). These cases, however, are readily distinguishable. In *Landrigan*, a post-AEDPA case, the defendant actively obstructed counsel's investigation and outright refused to allow counsel to present any mitigating evidence. 550 U.S. at 468-70. For example, the defendant explicitly instructed his mother and ex-wife not to testify. *Id.* at 469. Counsel tried to make a proffer of the witnesses' testimony, but the defendant repeatedly interrupted his presentation to the court to reiterate that he did not want mitigating evidence presented. *Id.* at 470. When the judge asked the defendant if he wanted to make a statement at the conclusion of the penalty phase, he responded: "I think if you want to give me the death penalty,

just bring it right on. I'm ready for it." *Id.* Similarly, the defendant in *Jeffries* refused to allow his counsel to present any mitigating evidence other than his brother's brief testimony regarding his artistic abilities. 5 F.3d at 1197. The defendant made his decision not to present a mitigation defense "after a weekend of discussions with his brother and with counsel." *Id.* After the defendant explained the various reasons underlying his decision to the trial court, counsel told the court he believed that the defendant "made [his decision] knowingly, voluntarily and intelligently" "after a weekend of soul searching." *Id.*

**[16]** By contrast, even if we credit counsel's testimony here, at most Hamilton refused to assist in his defense; he did not impede the many other avenues of mitigating evidence available to counsel. That counsel somehow learned of five people to interview and his investigator managed to obtain over two hundred pages of relevant documents undermines the State's argument that Hamilton obstructed the investigation. Moreover, unlike the defendant in *Landrigan*, Hamilton did not threaten to obstruct the presentation of any mitigating evidence that counsel found. Instead, after the trial court denied his request to read a statement to the jury, Hamilton allowed the penalty phase to proceed uninterrupted. Last, unlike the defendant in *Jeffries*, he did not make a knowing and informed decision not to present mitigating evidence. In any event, because counsel disregarded any alleged instructions to the contrary and presented a mitigation defense, albeit an insufficient one, we need not analyze the effect of Hamilton's alleged refusal to cooperate. *See Douglas*, 316 F.3d at 1089.

b)    *Penalty Phase Presentation*

**[17]** Defense counsel compounded the errors he committed during the investigative stage of the penalty phase by presenting almost none of the little mitigating evidence he had discovered. The penalty phase began on November 18, 1982, at 10:00 a.m. By 3:30 p.m. that day, after deliberating for only four hours, the jury had fixed Hamilton's sentence as death. Of the 2423-page trial transcript, the entire penalty phase spans just 39 pages. Counsel's anemic presentation resulted from a number of unjustifiable errors, which, taken together, render his performance deficient.

First, counsel waived his opening statement, as he had done during the guilt phase. He offered no explanation as to why he forfeited "his first opportunity to explain the significance of the mitigating evidence to the jury." *Mayfield*, 270 F.3d at 928 (internal quotation marks omitted); *see Ainsworth*, 268 F.3d at 874.

**[18]** Second, counsel presented only one witness—Hamilton's mother, Jackie—whose testimony occupies less than 5 pages of the transcript. Although Jackie had firsthand knowledge of the hardships Hamilton endured during his childhood, almost none of that information was presented to the jury, largely due to counsel's scant questioning. The following exchange is illustrative:

> Q:   All right. Now, Mrs. Piper, a number of years ago some problems developed in your home; is that correct?
>
> A:   That is.
>
> Q:   And at that time was Michael taken from you?
>
> A:   He was.

Q:   And was that by court? Can you explain that?

A:   It was by court order.

Q:   Okay. And for how long did Michael remain outside your home?

A:   I don't remember exactly.

Q:   Was it more than a year?

A:   Yes, it was.

.  .  .  .

Q:   Okay. And did he to your knowledge go from foster home to foster home?

A:   Yes, he did.

Q:   Okay. And the reason that he was removed was there were problems between you and your husband; is that correct?

A:   That's right.

Q:   Okay. And can you indicate to the ladies and gentlemen of the jury some of those problems regarding his drinking or whatever the problem was?

A:   I'd rather not. I don't believe this has anything to do with this at all.

Q:   But there were problems; is that correct?

A:   There are — there were.

Q:    There were problems with abuse?

A:    Yes.

Q:    And those are the things that led to Michael's
      — the removal of Michael from your home?

A:    Yes.

Counsel asked no further questions about the court order, why
Hamilton moved "from foster home to foster home," or the
nature of the "problems" with drinking and abuse, although he
was aware—at least to some extent—of this mitigating evi-
dence. Instead, counsel asked questions such as "[Hamilton
and Gwen's] marriage was good as far as you knew?" Given
that only three days before Hamilton had been found guilty of
murdering his wife by the same jury, this question epitomizes
counsel's deficient performance.

   Counsel's subsequent questioning about Hamilton's father
was similarly lacking:

Q:    [W]as there ever a relationship [between Hamil-
      ton and his father]?

A:    Not that I know of.

Q:    All right. And in part Michael's father was put
      in prison, was he not, or in a state hospital?

A:    In a state hospital, yes.

Q:    Thank you.

Because counsel failed to develop her answers, Jackie's testi-
mony left the false impression that Hamilton's childhood,
while unhappy, was not unusual. Indeed, the most detail Jac-
kie offered was a superficial statement that Hamilton was

kind to "stray animals and stray people" and loved his children. Jackie's reluctance to volunteer information about Hamilton's childhood is hardly surprising. Given her involvement in the abuse suffered by Hamilton and his siblings, which we discuss further below, and the fact that she testified for the prosecution during the guilt phase, Jackie was one of the worst witnesses that defense counsel could have presented to the jury.

Jackie's reticence can also be explained by counsel's failure to prepare her adequately. Even assuming counsel had planned to elicit from Jackie the details of Hamilton's childhood background—including the incest and abuse—as he testified at the evidentiary hearing, the effectiveness of that plan was severely undercut by not sharing it with Jackie. The record shows that counsel spent either little or no time preparing Jackie to testify. Counsel was "pretty sure" he met with Jackie before putting her on the stand and that she had been "reluctant" to talk. Counsel recalled Jackie being difficult on the stand as well, although he conceded that the transcript undermined his recollection. Jackie, by contrast, stated in a declaration filed in support of Hamilton's habeas petition that she did not recall meeting with Hamilton's defense counsel or anyone working on his behalf prior to or during the trial. She remembered being confused during the penalty phase and not knowing why defense counsel was asking her questions about her son's upbringing. Jackie's testimony corroborates her recollection and undermines defense counsel's. The most telling example is her response to counsel's question about the problems regarding Hamilton's father's drinking: "I don't believe [that information] has anything to do with this at all."

**[19]** Additional preparation would have made a difference. Jackie stated in her declaration that she would have testified in detail about the physical and sexual abuse if she had been asked to do so. Defense counsel's assertion that he tried to elicit this information is not supported by the record. As we previously have held, the failure to prepare a witness ade-

quately can render a penalty phase presentation deficient. *See, e.g.*, *Belmontes*, 529 F.3d at 851; *Douglas*, 316 F.3d at 1087. This is especially true when the insufficiently prepared witness is the *only* penalty phase witness called to testified.

[20] Counsel exacerbated the damage done during Jackie's testimony by not explaining the significance of the meager mitigating evidence during closing. *See Belmontes*, 529 F.3d at 846 n.3 ("Our cases make clear that in addition to presenting witnesses to testify about mitigating circumstances, defense counsel must also explain the significance of the mitigating testimony in his closing statement."). Counsel mentioned Jackie's testimony only once in passing. Moreover, rather than challenging the prosecutor's characterization of Hamilton's childhood as "unfortunate" but neither unusual nor extreme,[11] he effectively validated it. In addressing whether any circumstances extenuated the gravity of the crime, counsel explained: "Michael did come from a broken home. He was placed in foster home after foster home. I'm not telling you that's an excuse, because we know others have come from homes and have also grown up." Counsel drastically understated and mischaracterized Hamilton's home in referring to it as merely "broken." As we explain later, the environment in which Hamilton grew up was extraordinarily abusive and atypical in almost every sense. Yet, the jury remained unaware of this significant mitigating evidence. Having provided the jury with no reason to show mercy, defense counsel's naked pleas to spare Hamilton's life were futile. While "[b]egging for mercy is not incompetence per

---

[11]During his closing argument, the prosecutor stated:

> Now, I would suspect that counsel will argue that testimony that came from his mother Jacqueline Piper that he was taken away from his family for a period of time when he was young. And I'm not trying to be facetious, that is unfortunate. And that happens to so many people in our society. I think anyone sitting here can probably think of something bad that's happened in their childhood. But it's certainly not any justification for a crime as heinous as a crime that we have here today.

se," *Hendricks*, 70 F.3d at 1043, this strategy was unreasonable under the circumstances here.

The State contends that presenting the mitigating evidence that it acknowledges was available would have done more harm than good. There is nothing in the record that supports this assertion. A decision not to present mitigating evidence to the jury can be considered tactical only if counsel is aware of that information and how it could fit into a penalty phase defense. *See Mayfield*, 270 F.3d at 927 ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."). Defense counsel failed to pursue the relevant information provided to him by the five people he and Wells did interview, and did not even review the records unearthed during Wells's investigation. The record belies the State's assertion that defense counsel "would never have been able to obtain much of the evidence that Hamilton has submitted in support of his [habeas] petition . . . no matter what efforts he made."

Moreover, like counsel in *Wiggins*, defense counsel here "uncovered no evidence in [his] investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." 539 U.S. at 525. The evidence here was not a "basket of cobras"—there were no "obvious countervailing tactical dangers for petitioner." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) (internal quotation marks omitted). For example, contrary to his testimony, counsel had no tactical reason for not presenting Marvin, Hamilton's uncle, as a penalty phase witness. While Marvin did express some negative opinions about Hamilton during his interview with Wells, none of them would have done more harm than the failure to provide the jury with the evidence of the extreme sexual and physical abuse endured by Hamilton and his siblings. Defense counsel cited as one reason for not calling Marvin was his statement that Hamilton cheated on his wife and had been pri-

marily interested in the insurance money after her death. Only a few days before the penalty phase began, however, the jury had found that Hamilton cold-bloodedly killed his pregnant wife for financial gain. Thus, the potential damage that Marvin's testimony might have caused had already been inflicted. Marvin's belief that Hamilton did not pay attention to his children was also relatively innocuous, since the jury had already heard testimony that Hamilton initially planned to kill Gwen in front of his four children. In any event, limiting the scope of a penalty phase presentation to evidence that the defendant is a good person who has done good deeds is, in and of itself, unreasonable where there is an extreme unlikelihood that any testimony about the defendant's character would be sufficient to humanize him. *Correll*, 539 F.3d at 945-46. Marvin could have testified about the countless difficulties Hamilton endured as a child, which would have removed Hamilton from the category of those who have experienced "unfortunate" circumstances and placed him squarely in the realm of "unusual or extreme" childhood suffering. Instead, the jury heard only Jackie's vague and terse testimony, which can hardly be considered a mitigation defense, much less a strategically reasonable one.

Nor did counsel offer a legitimate reason for not trying to elicit the details of Hamilton's background from his sister Vicki. *See id.* at 948 ("A decision by counsel not to present mitigating evidence cannot be excused as a strategic decision unless it is supported by reasonable investigations."); *cf. Williams v. Woodford*, 384 F.3d 567, 616-624 (9th Cir. 2004) (listing four legitimate reasons that supported counsel's tactical decision not to present certain penalty phase evidence). On the contrary, counsel admitted that he never considered presenting Vicki as a penalty phase witness, even though she could have painted a portrait of Hamilton's childhood that would have greatly aided the jury as she had direct knowledge of the extensive abuse endured by Hamilton and his siblings.

[21] Counsel also acted deficiently in not contacting Hamilton's other sister, Carolyn, who could have provided the most

poignant and revealing mitigating evidence, as her declaration demonstrates. The district court clearly erred in finding that counsel could not talk to Carolyn because she was an "adverse part[y] represented by counsel," which was the reason defense counsel gave for not interviewing her. Carolyn was not an adverse party; she was Hamilton's codefendant. Moreover, defense counsel could have subpoenaed Carolyn to interview her about Hamilton's background. The district court's conclusion that counsel made a reasonable tactical decision to present only one witness is therefore clearly erroneous.

c)    *Available Mitigating Evidence*

[22] Counsel would have learned extensive information about Hamilton's background if he had conducted a reasonably thorough investigation. Various family members, physicians, and others could have testified about the abusive environment in which Hamilton grew up and his ongoing mental health problems.[12] This information could have been

---

[12]Hamilton presented the declarations of the following twenty-seven people at the 2003 evidentiary hearing:

- Jackie Piper (Hamilton's mother)
- Carolyn Hamilton (Hamilton's sister)
- Vicki Fitzherbert (Hamilton's sister)
- Christine Woods [née Grealish] (Hamilton's ex-wife)
- Donna Borgerding (Hamilton's maternal aunt)
- Patricia Johnson (Hamilton's maternal aunt)
- Carol Hamilton (Hamilton's paternal aunt; Marvin's wife)
- Elaine Honor (Hamilton's paternal aunt)
- Jack Hamilton (Hamilton's paternal uncle)
- Sandi Clark (Hamilton's cousin)
- Janel Daniels (Hamilton's cousin)
- Kristine Daniels (Hamilton's cousin)

corroborated and supplemented by available records.[13]

- Patricia Ketchum Ortega (Carolyn's foster sister and Gilbert Garay's girlfriend at the time of the crime)
- Lillian Cagle (ex-wife of Hamilton's father, Bob)
- Marian Anderson (ex-wife of Hamilton's cousin, Roy Hamilton)
- Patricia Hamilton (second wife of Roy Hamilton)
- Bill Underwood (son of Ernest and Nellie Underwood, Hamilton's foster parents)
- Nina Huff (neighbor of the Underwoods)
- James Beasely (nephew of Ruby and Oliver Cater, Hamilton's foster parents)
- Floyd Daniel (Hamilton's former employer)
- Lawrence McInerney (Hamilton's former employer)
- Mosetta Mangrum (Hamilton's former landlady)
- William Karwacki (retired school psychologist; evaluated Hamilton in 1964 at the request of his teacher)
- Dr. James W. Wilkins (retired clinical psychologist; evaluated Hamilton in 1965)
- Dr. James R. Merikangas (psychiatrist and neurologist; evaluated Hamilton in 1992)
- Shirley A. Reece, M.S.W. (clinical social worker; evaluated Hamilton in 1993)
- Dr. George Woods (psychiatrist; evaluated Hamilton in 1994).

[13]In addition to the "Prior Record" materials that counsel failed to review at the time of trial, Hamilton presented almost two hundred pages of other readily available documents that counsel never discovered. These documents include numerous psychological evaluations of Hamilton and recommendations for treatment, starting at the age of twelve; Bob's U.S. Air Force record (includes a discharge request due to Jackie's and Hamilton's "mental problems"; notes that Bob attempted suicide); Bob's criminal record for the incest offense (includes the complaint, arrest warrant, transcripts of proceedings, guilty-plea conviction, commitment to Atascadero State Hospital, and probation report); Atascadero State Hospital records (note Bob's diagnosis as a mentally disordered sex offender); Jackie's criminal record for contributing to the delinquency of a minor (includes the complaint, transcripts of proceedings, psychological evaluations, conviction, sentence, and probation report).

Because of counsel's deficient performance, however, the jury heard almost none of the following mitigating evidence.

i.    *Family Background and Social History*

For most of his childhood, Hamilton lived with his father, Bob, his mother, Jackie, and his younger sisters, Carolyn and Vicki. The family moved eleven times over a fourteen-year period due to Bob's service in the U.S. Air Force. Bob began drinking heavily when Hamilton was only six months old. As his drinking worsened, Bob became an increasingly "mean and vicious" man. He physically abused Jackie throughout their marriage. He also attempted to control her and the children at all times. He killed any pets to which the children grew attached. He also frequently terrorized the children by forcing them to watch as he battered and degraded their mother, often threatening to kill her. If the children attempted to flee, Bob would drag them back by their limbs or hair. At times, he and Jackie wielded butcher knives at one another while the children watched. They both regularly beat Hamilton using either a paddle, switch, belt, or closed fists, but otherwise ignored him.

Hamilton's parents engaged in inappropriate sexual behavior as well. Both parents walked around the home naked, fondling each other and making lewd comments in front of their children. On at least two occasions, Bob ritualistically lined up Hamilton and his sisters and made them watch as he forced Jackie to copulate him orally. Bob also sexually abused Carolyn for approximately four years. The abuse, which began when Carolyn was only ten years old, happened two to three times per week and included sexual intercourse and oral copulation. All of this occurred with the full knowledge of Hamilton's mother. Rather than protecting Carolyn from the abuse, she at times guarded the door to prevent Hamilton and Vicki from disturbing Bob and Carolyn in the bedroom. Jackie was also frequently present in the bed with her husband and daughter. On several occasions, Jackie pinned Carolyn to the

bed and covered her mouth so that Hamilton and Vicki would not hear her crying. Other times, Jackie participated in a "three-way deal" with her husband and Carolyn; Jackie would engage in mutual foreplay and intercourse with Bob before he penetrated Carolyn. Jackie also bought contraceptive jelly for her. Hamilton was aware of his father's sexual abuse and of his mother's acquiescence in it. He tried to defend his sister, but his father beat him and threatened to kill him.

The sexual abuse extended beyond Hamilton's immediate family. Bob's father had sexually abused both of Bob's sisters, and had tried to molest Carolyn. Two of Bob's brothers, Marvin and Don, sexually abused their daughters as well. Unbeknownst to Hamilton at the time, Marvin also sexually abused Carolyn. That abuse began after Bob's abuse was discovered, and continued sporadically for seven years until Carolyn was twenty-one.

Carolyn told Marvin and her aunt Karen about her father's abuse in March 1967, when she was fourteen and Hamilton was fifteen. Marvin and Karen in turn reported the abuse to the police. Bob was arrested immediately, and Jackie was arrested three days later. Hamilton and his siblings were then taken into protective custody. In a dependency petition filed in the Kern County Juvenile Court the following day (one of the documents in defense counsel's possession at the time of trial),[14] a probation officer described Hamilton's home as "an unfit place for him by reason of neglect, cruelty, or depravity" and "detrimental to said minor's moral upbringing in that said minor was present in the family home when incestuous acts occurred between said minor's sister, Carolyn Hamilton, and her father; further, said minor's mother, who had knowledge of the above mentioned incestuous activity, did nothing to

---

[14]As already discussed, most of the Kern County Juvenile Court records pertaining to Hamilton's removal from his parents' home and his subsequent placement in foster care were in counsel's possession at the time of trial, but he never reviewed them.

inhibit these acts." A ten-page report filed by another proba-
tion officer approximately two weeks later contains additional
detail about the sexual abuse and family history. The report
also includes statements by Hamilton, Carolyn, and Jackie.
The Kern County Juvenile Court adopted the report's recom-
mendation and declared Hamilton a dependent of the court
and placed him temporarily in shelter care.

Approximately a month after his arrest, Bob pled guilty to
the charge of "willfully, unlawfully, feloniously, knowingly
and incestuously hav[ing] sexual intercourse with [his daugh-
ter] Carolyn Marie Hamilton, of the age of fourteen years
old." After several psychiatric evaluations, Bob was adjudged
a mentally disordered sex offender and committed to Atas-
cadero State Hospital. He was released less than a year later
and sentenced to five years' probation. He was also required
to register as a sex offender and to avoid any contact with his
wife and children.

Jackie was charged with a misdemeanor violation of con-
tributing to the delinquency of a minor. She also underwent
psychiatric evaluation. One examiner noted that Jackie dem-
onstrated "no great remorse" for her role in the abuse. The
court ultimately determined that Jackie was not a mentally
disordered sex offender. She was sentenced to thirty days'
imprisonment and three years' probation. She was later sen-
tenced to another year in prison for violating her condition of
probation that she not see her children without court permis-
sion.

Hamilton spent the next few years moving from one foster
home to another. In May 1967, shortly after his parents'
arrests, he was placed with his uncle Marvin, with whom he
had a "friendly relationship." This relationship ended after a
few months, however, when Carolyn moved in and Hamilton
witnessed his uncle molesting her. Marvin was convicted of
grand theft shortly thereafter, and Hamilton and his sister
returned to shelter care. Hamilton was then placed with the

Rogers, with whom he had difficulty adjusting. His placement was terminated after a few months for unspecified reasons.

In January 1968, at the age of sixteen, Hamilton was placed in the foster home of Ernest and Nellie Underwood. In his declaration, the Underwoods' son, Bill, stated that Hamilton "had two sides to his personality. One side was a quiet, helpful, shy, obedient, and introverted child. The other was an irritable and agitated individual who did things on impulse. Most of these dark periods came after [Hamilton] had either personal or telephone contact with family members." Bill also noted that Hamilton "was a loner who had no close friends and few if any acquaintances." In December 1968, Hamilton was sent to juvenile hall on two separate occasions for using the Underwoods' truck and for attending his high school prom, both without their permission. On January 10, 1969, the Kern County Juvenile Court adjudged Hamilton a ward of the court. Hamilton remained in juvenile hall until February 7, 1969, when he was placed in his third foster home. The home was run by Ruby and Oliver Carter, who were known for physical punishment. According to their nephew, James Beasely, Hamilton was beaten by Ruby with a belt. Hamilton requested that his case worker remove him from their home. His placement with the Carters was terminated after only four months. Hamilton returned to his mother's home in June 1969.

As he had complied with the terms of his probation, Hamilton's wardship was dismissed on December 19, 1969, shortly after he married Christine Grealish. On April 23, 1970, their son was born. Hamilton's union with Christine was short-lived, however; they separated after a year and divorced in July 1973. During their marriage, Hamilton had a difficult time retaining a job and committed a number of relatively minor crimes. In April 1974, Hamilton married Gwen, whom he had been dating since his divorce. Between 1975 and 1980, he and Gwen had four children together. His employment and legal troubles continued during their marriage.

ii.  *Mental Health History*

Even a cursory investigation would have revealed that
Hamilton has suffered from serious mental health problems
throughout most of his life. The problems were first discov-
ered when Hamilton was twelve years old, around the time he
became aware of his father's sexual abuse of Carolyn. In Feb-
ruary 1964, William Karwacki, then a school psychologist,
conducted a clinical examination of Hamilton at the request
of one of his middle school teachers. Karwacki noted that his
1964 report observed that Hamilton's feelings of "resentment
and isolation" have caused him to react negatively and antiso-
cially in some instances, and violently and destructively in oth-
ers.[15] Karwacki also noted Hamilton's feeling that "his life
and efforts have generally ended in failure." Hamilton
appeared "well trained to offer a positive account of his home
environment to outsiders, and although acknowledging fre-
quent physical punishment, he hastened to add that he always
'had it coming.' " After evaluating Hamilton, Karwacki con-
cluded that Hamilton was "in critical need of immediate ther-
apeutic intervention, through treatment by either a child
psychiatrist or a psychiatric social worker." Karwacki
attempted to conference with Hamilton's parents, but they
were evasive and "expressed ignorance of any reasons for
[Hamilton's] psychological distress."

Approximately a year later, Hamilton took a personality
test used to assess mental, emotional, and psychological
pathology, which was administered by the Juvenile Court for
the Grant County Superior Court in Ephrata, Washington,
where Hamilton's family lived at the time. James Wilkins, a
clinical psychologist, examined the results of that test. Wil-

---

[15]Hamilton submitted Karwacki's 1964 report at the evidentiary hearing
held by the district court, along with a declaration prepared by Karwacki
in July 1994 at the request of Hamilton's habeas counsel. Karwacki notes
in his declaration that he was available and willing to testify at the time
of trial but was never contacted by anyone working on Hamilton's behalf.

kins diagnosed Hamilton as suffering from schizophrenic paranoid disturbances and feelings of depression and hopelessness. In a letter written to the Juvenile Probation Officer,[16] Wilkins noted that Hamilton's results demonstrated "unpredictability in behavior and attitude" and "[i]nner conflicts regarding sexual matters . . . [that] relate to feelings generated within the family." Based on his psychological assessment, Wilkins determined that Hamilton was "in immediate need of intensive psychological and/or psychiatric evaluation and treatment." The Juvenile Probation Officer agreed with Wilkins's recommendation and informed the Juvenile Department that Hamilton "is in definite need of either professional psychological help and [sic] possibly psychiatric care."

Hamilton's parents were aware of his mental health problems. In April 1967, Bob and Jackie requested that the Grant County Juvenile Department provide "professional help" for Hamilton due to his "adjustment problems." The following month, Bob requested a discharge from the Air Force on the ground that both his wife and son were suffering from mental health problems. In his request letter, Bob states that Hamilton "has a mental problem . . . [and] needs special schooling and psychiatric care." Although Bob's discharge request was granted, Hamilton never received any treatment.

By age eighteen, Hamilton's condition had worsened. According to Shirley Reece, a clinical social worker who evaluated him in 1994,[17] Hamilton recalled feeling hopeless and despondent about his life at the time. Hamilton's mental

---

[16]This letter, dated May 10, 1965, was submitted at the evidentiary hearing, as was a declaration prepared by Wilkins in July 1994. Wilkins was also available and willing to testify at the time of trial but was never contacted by anyone working on Hamilton's behalf.

[17]Reece prepared a thirty-two page declaration, which was submitted at the district court's evidentiary hearing, detailing Hamilton's social history and family background. To reach her conclusions, she interviewed Hamilton, Carolyn, Jackie, and one of Hamilton's aunts, and reviewed over 1200 pages of relevant documents.

health further deteriorated after he joined the Army at nineteen. Shortly after enlisting, he went AWOL and attempted suicide by slashing his wrists with a pen knife. Hamilton's then-wife Christine recalled Hamilton being severely depressed. Between January 1971 and July 1972, Hamilton went AWOL five more times. During one of his absences, he shot himself in the leg and refused hospital attention for fear of being arrested.

Mental health problems, like sexual abuse, were rampant in Hamilton's immediate and extended family as well. Prior to being discharged, Bob had threatened to commit suicide on several occasions. A clinical report prepared by Army medical examiners notes that, on one occasion in July 1964, Bob "made out a will in a local tavern, handed it to the tavern owner and stated he was going to commit suicide." In April 1965, Bob discharged a shotgun in his home while Hamilton and his siblings were there. Although Bob later said to the Army officials that it was an accident, he had initially told Jackie that it was a suicide attempt. He confirmed his statement to Jackie at the time of his arrest for incest. Carolyn later reported that Bob tried to kill himself on at least one other occasion when he was home alone with her.

Jackie also experienced mental health problems. In October 1965, she voluntarily admitted herself to the Agnews Developmental Center in San Jose. According to her record of admission, which Hamilton submitted at the evidentiary hearing, Jackie complained of experiencing depression for several months. She cried frequently and reportedly threatened "to harm her husband and children." Jackie was discharged with a diagnosis of "Psychoneurotic Reaction" and "Depressive Reaction." Although further treatment was recommended, there is no record of any follow-up.

Members of Hamilton's extended family suffered from depression and suicidal thoughts as well. His paternal great-grandmother spent time in a mental institution and later com-

mitted suicide. More recently, his cousin Roy, the son of Bob's brother Don, committed suicide in 1989. Roy's sister, Sandi, stated in her declaration that Roy was antisocial, moody, and paranoid in the years before his death.

### iii. *Mental Health at the Time of Trial*

Hamilton's mental health showed no signs of improvement two decades after his initial psychiatric evaluations. Rather, the available documentary evidence reveals he was still suffering from depression at the time of trial. Hamilton testified that he had attempted suicide in prison in December 1981, shortly after his wife's death, by injecting toilet bowl cleaner into his arm. Defense counsel was aware of the incident before trial began but disputed that it was a legitimate suicide attempt. Hamilton allegedly told counsel that he faked the attempt so he could sleep in a better bed, eat a good meal, and try to escape. Hamilton unequivocally denied making this statement.

Approximately five months after the alleged attempt, Hamilton was treated for depression while awaiting trial. The attending psychologist diagnosed him as having "[a]djustment disorder, with depressed mood subsequent to being incarcerated and charged with murder." A physician thereafter prescribed an antidepressant medication, Tofranil. On October 18, 1982, one month before the penalty phase, Hamilton wrote defense counsel a note telling him that he was taking Tofranil. Hamilton provided a telephone number followed by the words, "Mental Health"; beneath the number, Hamilton wrote, "Ask to speak to someone concerning my medication." Counsel testified at the evidentiary hearing that he never investigated the specific effects of Tofranil. It is undisputed that defense counsel was not a physician or otherwise qualified to evaluate Hamilton's mental health at the time of trial.

When Hamilton was reevaluated for purposes of his habeas petition by Shirley Reece, George Woods (a psychiatrist), and

James Merikangas (a psychiatrist and neurologist),[18] they all agreed that his abusive childhood had adversely impacted his mental health and that the negative effects had worsened over time. These effects were explained in the declarations that these doctors submitted at the evidentiary hearing. Reece summarizes her evaluation of Hamilton as follows:

> To know and understand Michael Hamilton, one must consult many first hand sources, most important of which are the family into which he was born. By all current measures, he was raised in an environment of intergenerational alcoholism, child abuse, and domestic violence . . . . [Y]et, tragically no individual, agency, nor military authorities ever intervened to protect the children . . . . . There is abundant evidence that all of the children in the Hamilton family were severely deprived in every sense of the word and lacked the normal affectional bonds and guidance which foster healthy development and prosocial behavior . . . . Michael was repeatedly subjected to gross maltreatment and incredible psychological abuse; and surely by all reasonable standards his parents' behavior was both deviant and depraved.

Woods's declaration corroborates Reece's assessment of Hamilton's background and supplements it with medical opinions. Woods observes that Hamilton's "sense of hopelessness, learned helplessness and chronic anxiety have their roots in those times he was forced to witness sadistic attacks against family members and was unable to help them." Woods concludes that, throughout his life, Hamilton has endured "environmental, developmental and traumagenic factors beyond his

---

[18]Like Reece, Woods both interviewed Hamilton and reviewed over one thousand pages of relevant documents as part of his evaluation. Although Merikangas did not interview Hamilton, he did review all the available medical records and other relevant documents.

control," which have resulted in "serious psychiatric disorders that substantially altered his ability to understand and function in the world around him." Woods determines that these disorders "compromise [Hamilton's] ability fully to appreciate the nature and consequences of his acts or to conform his conduct to the requirement of law." Woods adds that the medication Hamilton was taking during trial "exacerbated preexisting mental disorders and made it extremely unlikely that he would have been able to weigh and consider such issues as the advantages and disadvantages to testifying." Merikangas's review of the relevant records similarly led him to conclude that "Hamilton in all likelihood has significant neurological dysfunction and psychiatric impairments that affected his behavior both at the time of the offense and subsequently." The State offered no testimony or declarations to rebut the conclusions of Reece, Woods, and Merikangas.

**[23]** "We realize that the duty to investigate and prepare a defense is not limitless," and that "it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue every path until it bears fruit or until all conceivable hope withers." *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir. 1983) (quoting *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980)) (internal quotation marks omitted). We impose nowhere near that standard of perfection here. Defense counsel did not even exhaust the few sources of information of which he was aware. Rather, he effectively abandoned his investigation "after having acquired only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Given the abundance of classic mitigating evidence that was available, we conclude that counsel's investigation fell far below the constitutional floor.

d)  *1982 Standard*

**[24]** In reaching its conclusion that defense counsel's performance was not deficient, the district court went astray by

holding counsel to a lesser standard of performance than existed in 1982. As the Supreme Court has long recognized, the ABA Standards for Criminal Justice provide guidance as to what constitutes a "reasonable" performance. *Strickland*, 466 U.S. at 688-89; *see Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 396. The standards in effect at the time of Hamilton's trial recognized that "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore *all* avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980) (emphasis added). Fulfilling these obligations was as crucial in 1982 as it is today "in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding." *Ainsworth*, 268 F.3d at 877. We thus have held that trial counsel falls below these standards by failing to investigate adequately and present available mitigating evidence to the jury. *See, e.g.*, *Summerlin*, 427 F.3d at 629-33 (1982 trial) (holding that counsel performed deficiently where he failed to investigate and present available mitigating evidence that the defendant was severely abused as a child and had suffered from ongoing mental health problems); *see also*, *e.g.*, *Karis*, 283 F.3d at 1139 (1982 trial) (holding that counsel's performance was not reasonable under the circumstances where he was aware of evidence that the defendant was severely beaten as a child and yet failed to investigate the evidence further or to present it to the jury); *Silva*, 279 F.3d at 847 (1982 trial) (holding that counsel was deficient in failing to meet his "duty to determine what evidence was out there in mitigation in order to make an informed decision as to how to best represent his client"); *Ainsworth*, 268 F.3d at 877 (1980 trial) ("[C]ounsel's deficient performance resulted from the failure to prepare and present mitigating evidence, interview witnesses, and investigate available documents and other available information.").

The district court made much of the fact that the "[s]tandard practice in death penalty defense in Tulare County

in 1982, the time of Hamilton's trial, was different from today['s]." In focusing on the particular ways in which the "standard practice" has changed, however, the district court failed to recognize the ways it has remained the same. For example, we need not decide whether standard practice at the time of trial included retaining a "mitigation expert"— someone specially trained in investigating and presenting mitigating evidence at the penalty phase of a capital trial— because the deficient performance here did not result from counsel's failure to hire a specialized investigator. Rather, it resulted from counsel's failure to pursue obvious leads provided by the people he did interview, to review relevant documents that were in his possession, and to present to the jury the mitigating evidence of which he was aware, among the other errors we have chronicled above. Similarly, we need not decide whether standard capital practice in Tulare County in 1982 included preparing a "social history" report per se. It is undisputed that counsel was required to obtain the type of available information that a social history report would contain, such as family and social background and mental health, which Hamilton's counsel failed to do.

**[25]** The district court clearly erred in relying on the testimony of Hamilton's trial counsel as to the "standard capital practice" at the time of trial and rejecting the testimony of Hamilton's *Strickland* expert. Trial counsel had never before worked on a death penalty case, had never attended a death penalty seminar, and did not recall looking into the ABA standards before or during his representation of Hamilton. By contrast, the *Strickland* expert's testimony as to the minimal steps that counsel was required to take in 1982 is consistent with our established case law and that of the Supreme Court. The district court's finding that defense counsel satisfied these minimal obligations is clearly erroneous. The jury "saw only glimmers of the defendant's history, and received no evidence about its significance vis-a-vis mitigating circumstances." *Ainsworth*, 268 F.3d at 874 (alterations and internal quotation marks omitted). Moreover, as in *Ainsworth*, "[a] reasonable

investigation would have uncovered a substantial amount of readily available mitigating evidence that could have been presented to the jury." *Id.* Because both the investigation and presentation of mitigating evidence at the penalty phase were unreasonable under the prevailing professional norms at the time of trial, we hold that counsel's performance was deficient.

### 2. *Prejudice*

Deficiency and prejudice questions, although distinct, are closely related. *Correll*, 539 F.3d at 951. To establish prejudice, Hamilton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Belmontes*, 529 F.3d at 863 (clarifying that the reasonable probability standard is "less than the preponderance more-likely-than-not standard" (internal quotation marks omitted)). Accordingly, "[i]n establishing prejudice under *Strickland*, it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll*, 539 F.3d at 951-52 (citing *Williams*, 529 U.S. at 398); *see Rompilla*, 545 U.S. at 393 ("[A]lthough we suppose it is possible that the jury could have heard . . . all [the mitigating evidence] and still decided on the death penalty, that is not the test.").

Instead, in assessing prejudice, we must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently," *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995), and "evaluate whether the difference between what was presented and what could have been presented is sufficient to 'undermine confidence in the outcome' of the proceedings," *Lambright*, 490 F.3d at 1121 (quoting *Strickland*, 466 U.S. at 694). This requires us to "evaluate the totality of

the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding" and "reweigh[ ] it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. "Prejudice is established if 'there is a reasonable probability that at least one juror would have struck a different balance' between life and death." *Belmontes*, 529 F.3d at 863 (quoting *Wiggins*, 539 U.S. at 537).

**[26]** Defense counsel failed to investigate and present a substantial amount of classic mitigating evidence. The portrait painted at the evidentiary hearing before the district court "was far different from the unfocused snapshot handed the superior court jury." *Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998). The jury that recommended the penalty of death heard only that Hamilton had been placed temporarily in foster care due to unspecified problems at home, that he was kind to stray animals and stray people, and that he loved his children. It had no knowledge of the indisputably horrific treatment Hamilton and his siblings suffered at the hands of his mother, father, and various extended family members. It did not hear that Hamilton had been diagnosed with mental health problems as early as age twelve, and that he had ongoing depression and suicidal thoughts through trial.

Both the Supreme Court and we have found the failure to investigate and present similar—and even less compelling—evidence to be highly prejudicial. *See, e.g.*, *Rompilla*, 545 U.S. at 390-93 (failure to discover and present evidence that defendant was raised in a slum; was beaten by his parents; witnessed his father's frequent abuse of his mother; quit school at sixteen; had no indoor plumbing; and may have had schizophrenia or another mental disorder); *Williams*, 529 U.S. at 369, 370 (failure to investigate and present evidence that defendant had been abused and neglected during his childhood, and that he was " 'borderline mentally retarded,' had suffered repeated head injuries, and might have mental impairments organic in origin"); *Belmontes*, 529 F.3d at 861-63 (counsel ignored tantalizing leads indicating that

defendant had suffered rheumatic fever and other illnesses as a child; suffered depression after the death of his sister; had an antisocial personality disorder; had a history of substance abuse; and had struggled academically until he dropped out of school); *Douglas*, 316 F.3d at 1088 (counsel failed to discover and present evidence that defendant was abandoned as a child and raised by foster parents, including an abusive alcoholic foster father who frequently locked him in a closet; rarely had enough food; and was beaten and raped in jail at the age of fifteen); *Karis*, 283 F.3d at 1139 (failure to present any evidence of the substantial abuse suffered by defendant; available records showed that defendant's father and stepfather "viciously beat" him and his mother on a regular basis).

The district court clearly erred in relying on the State's argument that the mitigating evidence could not have made a difference in the outcome of the penalty phase because the crime Hamilton committed was not "attributable to" his disadvantaged background or mental health problems. As a matter of law, the trial court could not have excluded the mitigating evidence on this ground. Doing so would have directly violated the Supreme Court's longstanding instruction that "a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death," as "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (internal quotation marks omitted); *see Tennard v. Dretke*, 542 U.S. 274, 285-88 (2004) (holding that evidence of impaired mental functioning is inherently mitigating, and that a defendant need not demonstrate a "nexus" between his mental capacity and the crime committed).

Counsel's failure to retain an expert to explain the mitigating value of Hamilton's traumatic childhood was all the more prejudicial because obtaining the evidence and calling an expert to explain its relationship to Hamilton's murder of his

wife—as opposed to a random act of violence aimed at society in general—could very well have altered the outcome. *See Belmontes*, 529 F.3d at 869 ("A lay juror is not trained to identify the specific psychological and behavioral consequences of the traumas that [the defendant] experienced . . . . Accordingly, expert testimony should have been presented with respect to these issues."); *see also Richter v. Hickman*, No. 06-15614, 2009 WL 2425390, at *15 (9th Cir. Aug. 10, 2009) (holding that the "primary source of prejudice lay . . . in counsel's failure to consult, and subsequently to call, an expert in blood spatter," where the blood spatter testimony was "the linchpin of the defense"). For example, Reece declares that Hamilton "is both a product and a victim of a very unstable and abusive home environment, characterized by [his] father's alcoholism, ongoing domestic violence, and the shared family 'secret' of the father's incestuous relationship with his oldest daughter." She adds that "several major studies (following subjects for more than 20 years) confirm the strongly negative impact of such environmental influences." Wilkins concludes that the "severity of the life-threatening violence, parental combat, and personal physical abuse to which [Hamilton] was exposed, was of the type recognized by clinicians as capable of producing thought disturbances, delusional thinking and dissociative behavior as defenses to immediate psychological trauma." Merikangas similarly observes that

> [v]ictimization as a child has catastrophic and permanent effects on those who, like [Hamilton], survive it. It has a severe impact on the child's mental development and maturation. Sustained feelings of terror, panic, confusion, and abandonment as a child have long term consequences for adult behavior. Psychosis, dissociative states, depression, disturbed thinking and alcohol and drug dependency are directly related to child victimization.

He also notes that "[p]hysical and emotional childhood trauma is especially devastating when the injuries are inflicted by those whom the child must rely on for protection."

While Woods agrees with the others experts' conclusions, he adds a different perspective as well:

> Michael responded to his father's abusive accesses and pathology by developing counter phobic reactions. Early on in his life, he vowed that he would not repeat the actions of his father or mother . . . . He overcame multigenerations of alcohol and drug abuse and did not drink alcoholic beverages or use drugs . . . . He resisted urges to fight or strike back, even when attacked by peers at school or his father at home, and was resolute in his desire to not become violent. He consciously devoted himself to not duplicating the behavior of his father.

The prosecutor repeatedly argued during his penalty phase closing argument that the death penalty should be imposed because Hamilton was a danger to society. Defense counsel could have rebutted this argument by demonstrating that the ongoing pattern of intergenerational abuse and the psychological damage inflicted on Hamilton by his family made it unlikely that he would have abused or killed anyone other than a family member, and thus was not a danger to society at large.

Because counsel knew almost none of the relevant mitigating evidence, however, he committed errors during his closing argument that compounded the prejudice caused by his failure to investigate. The prosecution had reviewed each of the eleven statutory factors that the jury was required to weigh in assessing the appropriateness of the death penalty. *See* Cal. Penal Code § 190.3 (West 1978). In addressing subsection (d), "whether or not the offense was committed while the defendant was under the influence of extreme mental or emo-

tional disturbance," the prosecution stated that "[t]here's no evidence certainly of any extreme mental or emotional disturbance."[19] The prosecution's statement was accurate in light of defense counsel's meager penalty phase preparation and presentation, and defense counsel had no basis on which to rebut it. Instead, he caused far more damage to his client than the prosecution with only three short statements: "Mental disease and intoxication is never an issue. It's not a factor. It does not need to be considered." Defense counsel thus abruptly shut the door on one of Hamilton's strongest mitigation defenses because he did not even know it existed.

We therefore place on one side of the scale the mitigating evidence adduced at trial and at the evidentiary hearing before the district court. Weighed against this evidence is at most two aggravating factors: Hamilton's prior felony conviction for grand theft,[20] and the circumstances of the crime. These factors alone do not tip the scale so far that no reasonable juror could have voted against the death penalty. *See Silva*, 279 F.3d at 849 ("[I]n spite of the undeniably horrific circumstances surrounding [the crime], 'this is not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances.'" (quoting *Bean*, 163 F.3d at 1081)). The prosecution conceded that the prior felony should not "enter into the jury's consideration." Regardless, this relatively minor offense would have been significantly outweighed by the available mitigating evidence.

**[27]** Turning to the second factor, we do not dispute that the circumstances of Hamilton's crime were cold and calcu-

---

[19]Although we do not reach Hamilton's claim that errors committed by the prosecution during the penalty phase constitute prosecutorial misconduct, we note that the prosecution's incorrect characterization of some of the § 190.3 factors likely added to the prejudice that Hamilton suffered on account of defense counsel's mistakes.

[20]Other than the record of this conviction, to which defense counsel had stipulated, the prosecution presented no aggravating evidence at the penalty phase.

lating, motivated by personal desire and greed. Yet, even the gruesome nature of a crime does "not necessarily mean the death penalty [i]s unavoidable." *Douglas*, 316 F.3d at 1091; *Hendricks*, 70 F.3d at 1044 (rejecting the argument that the substantial amount of aggravating evidence rendered the presentation of mitigating evidence futile, and noting that the factfinder in California has broad latitude to weigh the worth of the defendant's life). We have found that the defendant was prejudiced by counsel's deficient penalty phase investigation and presentation in cases involving comparable or even far more brutal crimes posing a greater threat to the public at large. *See, e.g.*, *Douglas*, 316 F.3d at 1082-83, 1091 (the defendant raped, tortured, and killed two teenage girls and buried them in the desert); *Lambright*, 490 F.3d at 1106-07, 1127-28 (the defendant watched as his codefendant repeatedly raped the victim; the defendant then killed the victim by stabbing her multiple times and smashing her head with a rock); *Hovey v. Ayers*, 458 F.3d 892, 898, 930 (9th Cir. 2006) (the defendant abducted and killed an eight-year old girl; she was found with numerous depressed skull fractures and laceration wounds); *Smith v. Stewart*, 189 F.3d 1004, 1006, 1013-14 (9th Cir. 1999) (the defendant raped two women; both victims were stabbed repeatedly, punctured with needles, bound with rope, suffocated by having dirt forced in their mouths, which were then taped shut; the victims were left naked in the desert to die, and one of them did). Given the compelling evidence of Hamilton's "excruciating life history" that could have been placed "on the mitigating side of the scale," *Wiggins*, 539 U.S. at 537, we conclude that " 'there is a reasonable probability that at least one juror would have struck a different balance' between life and death," *Belmontes*, 529 F.3d at 863 (quoting *Wiggins*, 539 U.S. at 537); *see also Summerlin*, 427 F.3d at 643-44.

Our precedent does not direct us to a contrary conclusion. In *Allen v. Woodford*, we held that counsel's failure to present any mitigating evidence was not prejudicial because the "heinous nature" of the defendant's crimes—murdering three peo-

ple and conspiring to murder four others while already
serving a life sentence for yet another murder—was not out-
weighed by the available mitigating evidence. 395 F.3d 979,
1010 (9th Cir. 2005). Yet, unlike the evidence pertaining to
Hamilton's abusive childhood and mental illness since at least
the age of twelve, the available mitigating evidence in *Allen*
was "entirely bereft of explanatory or exculpatory attributes."
*Id.* at 1005. Instead, it "consisted primarily of testimony that
at some points in his life Allen had been nice to some people
and that some people cared for him." *Id.* at 1007. In *Allen*, we
distinguished cases in which the jury was not presented with
mitigating evidence concerning an abusive childhood or other
traumatic experiences. *Id.* at 1005-07 (discussing *Douglas*,
*Silva*, *Wiggins*, and *Mayfield*).

   *Woodford v. Visciotti*, 537 U.S. 19 (2002) (per curiam), is
similarly inapposite. There, the defendant was convicted of "a
cold-blooded execution-style killing of one victim and
attempted execution-style killing of another, both during the
course of a preplanned armed robbery." *Id.* at 26. His prior
offenses included "the knifing of one man, and the stabbing
of a pregnant woman as she lay in bed trying to protect her
unborn baby." *Id.* Viewing the ineffective assistance claim
through the deferential lens of AEDPA, *id.* at 21, the Supreme
Court held that the state court's conclusion that the defendant
failed to demonstrate prejudice was not objectively unreason-
able, *id.* at 26-27. The Court emphasized the relative weak-
ness of the available mitigating evidence. *Id.* at 26. The
defendant showed only that, as a child, he had been berated,
lacked self-esteem, moved frequently, and possibly had a sei-
zure disorder. His "troubled family background" did not
include any evidence of physical abuse or severe deprivation.
*Id.* Because, unlike here, the defendant's childhood was not
marked by unimaginable horrors of which the jury should
have been made aware, *Visciotti* is readily distinguishable.
*See also Bible v. Ryan*, 571 F.3d 860, 872 (9th Cir. 2009)
(acknowledging that "significant aggravating circumstances
do not preclude a conclusion of prejudice," but finding no

prejudice where the mitigating evidence unearthed at the evidentiary hearing was either speculative or cumulative of the evidence presented at sentencing); *Brown v. Ornoksi*, 503 F.3d 1006, 1016 (9th Cir. 2007) ("To be sure, horrific facts do not preclude a finding of prejudice . . . . But giving the state court decision the deference it is due under AEDPA, we cannot say that the California Supreme Court was objectively unreasonable in concluding that Brown had not satisfied both prongs of *Strickland*." (citations omitted)).

**[28]** The State has failed to demonstrate that the aggravating circumstances so outweighed the mitigating evidence as to render the death penalty inevitable. As in *Wiggins*, "there is a reasonable probability that at least one juror would have struck a different balance" between life and death "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale." 539 U.S. at 537. Counsel's failure to investigate and present the ample mitigating evidence thus "undermine[s] confidence in the outcome." *Strickland*, 466 U.S. at 694. Therefore, we hold that Hamilton has satisfied his burden of establishing prejudice.

## IV.   CONCLUSION

**[29]** Hamilton was constitutionally entitled to effective representation at the penalty phase of his capital trial, but he did not receive it. His counsel failed to investigate a substantial amount of available mitigating evidence concerning Hamilton's horrific childhood and mental illness, and thus could not possibly have made a strategic decision as to a mitigation defense. Counsel compounded these errors by presenting only one witness, Hamilton's mother, whose testimony was likely more harmful than helpful. "[C]ounsel's duty is not discharged merely by presenting some limited evidence. Rather, a penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706,

716 (9th Cir. 2004). It is difficult to imagine a more significant discrepancy than that between the portrait painted at the penalty phase of a man whose childhood was "unfortunate" but largely unmarred, and that of a child who was raised in the presence of incest, rape, and violence, suffered from mental illness, and was shuffled from home to home. Although this classic mitigating evidence was available to defense counsel at the time of trial, it was only revealed years after Hamilton was sentenced to death. We therefore hold that Hamilton was denied effective assistance of counsel. Accordingly, we reverse the district court's judgment and remand with instructions to issue the writ and return the case to the Tulare County Superior Court to reduce Hamilton's sentence to life imprisonment without the possibility of parole, unless the State pursues a new sentencing proceeding within a reasonable amount of time, as determined by the district court. We affirm the district court's denial of habeas relief as to guilt phase issues.

**AFFIRMED in part; REVERSED in part; and REMANDED.**